# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

| | | |
|---|---|---|
| LYNN BERNSTEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **AMENDED COMPLAINT** |
| | ) | |
| GARY SIMS, individually and in | ) | |
| his official capacity as Director | ) | |
| of Elections for the Wake County | ) | |
| Board of Elections; and | ) | |
| WAKE COUNTY BOARD | ) | |
| OF ELECTIONS, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff Lynn Bernstein hereby files this Amended Complaint against Gary Sims, individually and in his official capacity as Director of Elections for the Wake County Board of Elections, and the Wake County Board of Elections, and alleges upon information and belief as follows:

## INTRODUCTION

1.      This is a case about a government that is so intent on keeping its operations hidden from public view that it has taken blatantly unconstitutional action to forever bar from its property a well-respected citizen of Wake County without cause.

2. Even after the filing of Ms. Bernstein's original complaint in this Court, Defendants continue to enforce the ban on Ms. Bernstein and contend that they may ban her *indefinitely* from Wake County Board of Elections' property, notwithstanding the fact that doing so infringes on her constitutional rights, including her right to free speech, right to petition her government, and right to vote.

3. The plaintiff, Lynn Bernstein, is a respected and accomplished advocate for election integrity in North Carolina. On May 14, 2022, however, Defendants used false allegations as a pretext to "trespass" her, thereby forever banning her from Board of Elections property. The ban could reasonably be interpreted to apply to *any* Wake County Board of Elections property, even if that property is accessed for purposes of voting and even if that property is only temporarily under the Board's control as a polling place. Ms. Bernstein is indisputably being deprived of the opportunity to come to Board meetings and events, file to run for office in person (as most candidates do), observe logic and accuracy testing, take poll worker training, work as a poll worker at the Board's central operations center (also called the "warehouse") during early voting, be a political election observer at the Board's "warehouse"

during early voting, or serve as a poll greeter at the Board's "warehouse" during early voting.

4.    Though Defendants *now*, in this Court, finally say the ban applies only to the Board's "warehouse," where the Board is headquartered and manages its operations, Defendants never took any action prior to the filing of their motion to dismiss to clarify, through any means, this interpretation to Ms. Bernstein.  As a result, Ms. Bernstein has fears, and continues to fear, that she cannot even vote in-person at an early voting site or at her precinct on election day because the ban arguably applies to even property temporarily under the control of the Defendants. Even if the ban does only apply to the warehouse, though, Ms. Bernstein is still denied a host of constitutional rights, including the right to free speech, the right to the petition the Board, the right to serve as a poll greeter or official at the warehouse (where much early voting occurs), and the right to cast her vote on equal terms with other Wake County residents.

5.    Defendants' draconian and unconstitutional action against Ms. Bernstein calls out for immediate relief from this Court.

# THE PARTIES

6.     Plaintiff Lynn Bernstein ("Ms. Bernstein" or "Plaintiff") is a citizen and resident of the Town of Cary, Wake County, North Carolina. In 2019, she founded Transparent Elections NC, a group of nonpartisan volunteers who work with election officials to ensure that elections are secure, transparent, robustly audited, and publicly verified. Ms. Bernstein advocates for secure and transparent elections on a nonpartisan basis, working with elected officials and members of all political parties toward the goal of election integrity.

7.     Defendant Gary Sims is, upon information and belief, a citizen and resident of Johnston County, North Carolina, and the Director of Elections for the Wake County Board of Elections. As the Board's Director, he is responsible for the day-to-day direction and management of the Board's activities, including those of its agents and employees. He is also responsible for carrying out those duties delegated to him by the Board. He is sued here in his official capacity only, except as to Counts VI and VII, where he is sued only in his individual capacity.

8.     Defendant Wake County Board of Elections ("Board of Elections" or "Board") is an agency or department of the government of Wake County, North Carolina, that is statutorily empowered to

4

administer all elections in Wake County and maintain the County's voter rolls. Defendant Board is responsible for supervising, educating, and managing Defendant Sims and ensuring that his actions are consistent with state law and Board policy.

9. At all times relevant to this amended complaint, each of the Defendants acted under color of state law.

10. At all times relevant to this amended complaint, Board employee or agent Officer Janice Carter, a former Wake County Sheriff's deputy, acted under color of state law and under the direct supervision and direction of Defendant Sims, who controlled and directed all of the actions she took that give rise to this suit.

11. Defendants are capable of being sued under both federal and North Carolina law.

12. Defendants are not entitled to any governmental or sovereign immunity from the claims asserted herein as all such immunity has either been duly abrogated pursuant to federal or state law or waived, in whole or in part, by Defendants.

13. Defendants and their officials are responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, laws, policies, practices, procedures, and/or customs that deprived and are

5

depriving Ms. Bernstein of her fundamental rights. These rules, regulations, laws, policies, practices, procedures, and/or customs are the moving force behind the actions that deprived and are depriving Ms. Bernstein of her rights as set forth in this complaint.

14. Additionally, Defendants have failed to follow the standard policies and practices for the Wake County government regarding trespasses and appeals of trespass orders, and Defendants have made no effort to rectify their violation of official policy.

15. Defendants approved of, directed, and/or ratified the acts, policies, practices, customs, and/or procedures of their personnel, agents, and employees that deprived and are depriving Ms. Bernstein of her rights as set forth in this amended complaint.

16. Defendant Board of Elections has specifically affirmed, approved of, and ratified the actions of Defendants Sims and Officer Carter, who aided in the trespassing of Ms. Bernstein, on May 14, 2022, that have deprived and are depriving Ms. Bernstein of her rights—in particular:

> a. Defendant Board, and each of its members, are aware of Defendants Sims' animus and dislike of Ms. Bernstein;

6

b. Defendant Board, and each of its members, are aware that Defendant Sims' animus and dislike of Ms. Bernstein is longstanding and based on her exercise of constitutional rights, including her advocacy for election integrity, and not based on any legitimate grounds;

c. Defendant Board, and each of its members, are aware that Ms. Bernstein has been trespassed from, and ordered not to enter upon, Wake County Board of Elections property;

d. Defendant Board, and each of its members, have the final authority to make policy and decisions, including the decision of whether Ms. Bernstein should continue to be banned from entering upon Wake County Board of Elections property;

e. Defendant Board, and each of its members, have full access to any and all evidence used by Defendant Sims for his decision to trespass and ban Ms. Bernstein, including video evidence of the alleged incident;

f. Defendant Board, and each of its members, have either reviewed such evidence and thus have actual knowledge

7

of the fact that there was no basis for banning Ms. Bernstein, or they have deliberately decided not to review such evidence so as to maintain willful blindness, an act which equates to actual knowledge under the law;

g. Defendant Board, and each of its members, are aware of Ms. Bernstein's request and desire to have the ban lifted, as manifested, *inter alia*, in public statements from her husband and a written statement from her daughter as well as the filing of this lawsuit;

h. Defendant Board has the power and authority to reverse, vacate, or modify the ban enacted by Defendant Sims at any time, and it could easily exercise this power with little inconvenience;

i. Defendant Board, and each of its members, have deliberately decided not to act on Ms. Bernstein's request to have the ban lifted and have persisted in their decision not to lift said ban;

j. Defendant Board, and each of its members, have never invited Ms. Bernstein to appear before the Board to

8

plead her case for lifting the ban, even though they each know she desires it to be lifted;

k.  Defendant Board, and each of its members, are aware of the detrimental consequences for Ms. Bernstein of the ban, including (but not limited to) prohibiting her from attending, speaking during, or advocating at Board meetings, limiting her right to vote, and infringing on her right to free speech;

l.  Defendant Board, and each of its members, have accordingly ratified, affirmed, approved, and concurred in Defendant Sims and Officer Carters' actions in trespassing and banning Ms. Bernstein from Wake County Board of Elections property;

m. Defendant Board has therefore manifested a desire to have the trespass order and banning of Ms. Bernstein remain in place as the official judgment, decision, and policy of Defendant Board, even though two of its members (both Republican and thus minority members of the Board) has stated their support for Ms. Bernstein returning to Board meetings;

9

n. Defendant Board has failed to place the issue of banning Ms. Bernstein on any type of agenda for formal or informal consideration nor has it made any other effort to consider an appeal of her request to have the ban lifted; and

o. No member of Defendant Board has acted to lift the ban on Ms. Bernstein, even though each member is aware that she has been banned.

17.    Defendant Sims acted under color of state law, the actions and failure to act by Defendant Board of Elections' employees and agents, including Defendant Sims and Officer Carter, deprived Ms. Bernstein of particular rights under the Constitution and laws of the United States; the Defendant Board is the final policymaker for the Board of Elections concerning its employees and agents who acted under color of state law, including Defendant Sims and Officer Carter; the Defendant Board had final policymaking authority concerning its employees and agents who acted under color of state law, including Defendant Sims and Officer Carter; and Defendant Board ratified, approved, and affirmed Defendant Sims' and Officer Carter's actions and failure to act with respect to Ms. Bernstein—that is, Defendant Board knows of and has specifically made

a deliberate choice to ratify, approve, affirm, endorse, and concur in the actions and inactions of its employees and agents who acted under color of state law, including Defendant Sims and Officer Carter, with respect to the ban on Ms. Bernstein and the basis for such action and inaction.

18. The banning of Ms. Bernstein from Wake County Board of Elections property is the official final judgment, decision, and policy of Defendants, including Defendant Board of Elections and each of its individual members.

19. Defendants are policy makers fully and in fact aware of the unconstitutional deprivation of Ms. Bernstein's rights. They have acted with deliberate indifference to those rights, instead adopting, affirming, endorsing, and ratifying the ban on Ms. Bernstein as Defendants' official policy and position.

20. Defendant could easily reverse or modify the trespassing of Ms. Bernstein and permit her onto Wake Board of Elections property, but Defendants have made a conscious, deliberate, willful, and ongoing decision to ban Ms. Bernstein indefinitely.

21. Defendants' ban on Ms. Bernstein of indefinite duration, great severity, and results from affirmative decisions and omissions of the relevant policymakers, who are sued as the Defendants here.

22. Defendants have deliberately failed to follow and deviated from official Wake County policy for making trespassing decisions and considering appeals of trespass orders, and Defendant Board has failed to train and supervise its employees and agents, including Defendant Sims and Officer Carter, concerning said policy and to otherwise train and supervise its employees and agents, including Defendant Sims and Officer Carter, concerning respect for the constitutional rights of citizens.

23. Accordingly, it is the official position and policy of Defendants, including Defendant Board of Elections, to ban Ms. Bernstein from its property (or, at a minimum, to ban her from the Board's warehouse).

24. Pursuant to North Carolina law, the acts of Defendant Sims, as the properly appointed Director of Elections, are deemed to be the acts of Defendant Board of Elections, its officers, and members.

25. Defendants further failed to properly train those under their control, including Defendant Sims and Officer Carter, and said failure proximately caused injury to Ms. Bernstein. Said failure is illustrated by, among other things, Defendants' deviation from and failure to follow official Wake County policy concerning decisions to "trespass" individuals from property and the appeals process for trespass orders.

26.     Defendant Board knew of Defendant Sims' animus and hostility toward Ms. Bernstein well prior to these events, as well as his animus and hostility to others who engage in public advocacy with the Board, a position he has freely expressed to the media.  Nevertheless, the Board has continued to employ Defendant Sims, has—upon information and belief—never sought to compel Defendant Sims to undergo any remedial training regarding the protection of individuals' rights, and has even now failed to remedy his unconstitutional ban on Ms. Bernstein, even though the procedure by which Defendant Sims effected the ban violated Wake County governmental policy regarding trespass orders and appeals therefrom.  Defendants have accordingly been deliberately indifferent to the exercise of constitutional rights, including Ms. Bernstein's exercise of her rights.

27.     Accordingly, Defendants are legally answerable and liable for the acts and omissions of their employees and agents, including Defendant Sims and Officer Carter, with respect to the trespassing and banning of Ms. Bernstein.

28.     In the alternative, it is alleged that Defendant Gary Sims is the final policymaker for the Board of Elections concerning its employees and agents who acted under color of state law, including himself and

13

Officer Carter; Defendant Sims had final policymaking authority concerning its employees and agents who acted under color of state law, including himself and Officer Carter; and Defendant Sims has ratified, approved, endorsed, and affirmed his and Officer Carter's actions and failure to act with respect to Ms. Bernstein—that is, Defendant Sims knows of and has specifically made a deliberate choice to ratify, approve, affirm, endorse, and concur in the actions and inactions of Board employees and agents who acted under color of state law, including himself and Officer Carter, and the basis for such action and inaction. As a result, Defendant Board is liable for the acts of Defendant Sims, who duly and lawfully acted as its final policymaker.

29.    Counts I through V and Count VIII are asserted against all Defendants in their official capacities only.  Counts VI and VII are asserted against Defendant Sims in his individual capacity only.

## JURISDICTION AND VENUE

30.    This Court may properly exercise personal jurisdiction over the parties.

31.    The Court has both general and specific jurisdiction over Defendants.

32. This Court has federal question jurisdiction over Ms. Bernstein's claims under federal law pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983.

33. Ms. Bernstein's state law claims are properly before this Court pursuant to 28 U.S.C. § 1367(a) because those state law claims are so related to the claims in the action that are within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

34. This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, implemented through Rule 57 of the Federal Rules of Civil Procedure.

35. This Court is authorized to grant Ms. Bernstein's prayer for injunctive relief pursuant to Fed. R. Civ. P. 65.

36. Venue is properly laid in this court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because it is a judicial district in which a defendant resides as well as a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

37. Venue is proper in this division under Eastern District Local Civil Rule 40.1(c)(1).

38. This complaint has been timely filed prior to the running of the applicable statutes of limitations and repose.

39. Any and all conditions precedent to the bringing of this suit have been satisfied, and Ms. Bernstein's claims are ripe for review and decision.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES AND RIPENESS OF CLAIMS

40. Ms. Bernstein has complied with all applicable requirements for administrative exhaustion. Additionally, and in the alternative, any efforts to pursue an administrative appeal would have been futile due to actions attributable entirely to Defendants.

41. In particular, Ms. Bernstein's husband attempted to address the Board of Elections concerning this matter on May 16, 2022, but he was allowed less than his allotted two minutes to speak before the Defendant Board's chairperson directed a security officer to remove him from the meeting. Mr. Bernstein returned to speak at two subsequent Board meetings, on May 17 and May 26, and Ms. Bernstein's 14-year old daughter submitted a written plea to the Board at the May 17 meeting, to ask the Board to revoke the ban, but Defendant Board has taken no

action to revoke, lift, vacate, suspend, or otherwise modify the permanent and indefinite ban on Ms. Bernstein.

42. Ms. Bernstein also contacted a sitting Wake County Commissioner via email and text, explaining the trespass situation and asking for guidance on how to appeal. Ms. Bernstein clearly states in her email that she is concerned about contacting the Board using their personal email addresses, which is the only way to contact the Board directly. Defendant Sims has refused to provide members of the Wake County Board of Elections individual .gov email addresses, making a general .gov email address (of which Defendant Sims is presumably the gatekeeper) the only means by which any member of the public can officially communicate with members of the Board. That contact did not result in any change in Defendants' policy or position regarding Ms. Bernstein.

43. Wake County has a formal process for imposing and hearing appeals of trespass orders, but Defendants did not follow that process in this case. As a result, Defendants never notified Ms. Bernstein of any process to appeal and deviated from the mandated process required to be utilized by entities of the Wake County government.

44.    Exhaustion of administrative remedies is also not required prior to Ms. Bernstein suing to vindicate her federal and state constitutional rights in court.

45.    Ms. Bernstein's claims are ripe for adjudication, as they are not hypothetical, abstract, or contingent, but instead she has suffered and will continue to suffer concrete injury to her rights, including constitutionally protected rights.

46.    The loss of constitutional rights, even for a moment, is irreparable harm.

47.    Even if Defendants attempt to moot Ms. Bernstein's claims after the filing of this suit, the Court will still have jurisdiction because of the past injuries alleged herein as well as the fact that the harms at issue qualify as capable of repetition yet evading review.  Given the demonstrated animus held by Defendants toward Ms. Bernstein, Defendants could easily decide to again ban her close to an election, depriving her of important constitutional rights when there would be inadequate time to challenge those restrictions.

## FACTS

48.    Ms. Bernstein is a longtime advocate for elections that are transparent, trackable, robustly audited, and publicly verified.

18

49.    Having earned a B.S. degree in Aerospace Engineering from the University of Colorado, Boulder, and then having worked in the aerospace industry, Ms. Bernstein uses her technical training and experience to advocate, in a nonpartisan way, for measures that would improve the security and technological reliability of election equipment as well as related elections procedures.

50.    As part of her public advocacy, Ms. Bernstein founded and runs Transparent Elections NC, a volunteer group working to ensure that North Carolina elections are worthy of the public's trust.

51.    Ms. Bernstein is also a trained International Election Observer, a member of the Election Verification Network, a member of the National Voting Rights Task Force, a member of the Carter Center Advisory Council for Fair, Safe and Secure Elections in North Carolina, a Board Member of AUDIT USA Elections, and an active member of the Wake County Democratic Party, serving as a Board Member for the Democratic Women of Wake County and as a Member of the Executive Committee for the NC Democratic Party Disability Issues Caucus.

52.    Ms. Bernstein has convinced others, including some elected officials, to support her efforts. Some of the ideas she has championed have even been adopted by policy makers. For example, her advocacy in

19

Guilford County concerning the type of voting machines to be purchased helped the County save over $5.8 million by selecting a hand-marked paper ballot system instead of ballot marking devices for all voters. Guilford County was then able to spend the $5.8 million that it saved on its voting system on such needs as air conditioning for schools and pay increases for school bus drivers. Another example is that the North Carolina State Board of Elections adopted her suggestion for changing its previously secret audit selection process used for randomly determining which precincts will be audited. Now, the State Board uses a transparent process that members of the public can verify themselves.

53. Ms. Bernstein is not compensated for her work; instead, her election integrity work is done on a voluntary basis and motivated by her civic-mindedness.

54. Because her work demands that elections officials discharge their duties in a transparent and accountable manner, as required by State law, however, she has drawn the ire of some officials.

55. This is especially true in the case of Defendant Gary Sims, Director of the Wake County Board of Elections, who has even complained to the media about individuals lawfully exercising their rights under state and federal law.

56.    During the 2020 election, Defendant Sims attempted to intimidate Ms. Bernstein, who was then the lead at-large observer for the Wake County Democratic Party.  Bernstein had been appointed as the lead at-large observer for the Wake County Democratic Party for the 2020 Primary Election.

57.    An observer on her team was denied being shown the "zero tapes" at the start of the election at a key precinct at the direction of Mr. Sims.  Later that morning, Defendant Sims, called another of the at-large observers via the help desk at a precinct and yelled at her.  He told her to relay the message that if anyone "so much as asked to see another zero tape" that he would ban all of the Party's at-large observers for the remainder of the election.  Ms. Bernstein called her neighbor to ask if he would go to that key precinct to witness the vote count at the end of the night and take a photo of the poll tape.  In apparent compliance with instructions from Defendant Sims, the precinct's chief judge refused to show him the photo of the tape or even verbally announce the results, in contravention of all standard election policy and practice in this State, including (but not limited to) 08 N.C. Adm. Code 06B.0105.

58.    Following that incident, Ms. Bernstein and her neighbor drove to the Wake Board of Elections warehouse in order to see the poll

21

tapes. Defendant Sims approached Ms. Bernstein and her neighbor in the parking lot and made clear that if they did not leave, the police would be called. While this transpired, a quorum of three members of Defendant Board were present inside the warehouse to which Ms. Bernstein and her neighbor were being denied entry; this quorum of the Board made it a meeting subject to the public observation requirements of North Carolina law. Since that election, Defendant Board has ensured that only two members of the Board are present at the warehouse on election night so as to keep the public from observing the vote count due to the lack of a Board quorum. Even though Ms. Bernstein had a right under state law to be at this meeting of a quorum of the Board engaging in official business, she peacefully left when denied entry by Defendants.

59. Ms. Bernstein has been involved in other issues that have drawn the anger of Defendant Sims. For example, in addition to her criticism of the Board's blocking access to zero tape verification and results tape verification, she discovered illegal ballot processing while observing the 2020 Primary. In this instance, after five months of advocacy, the State Board of Elections expressly sided with Ms. Bernstein and her group in a memo issued just seven days prior to the opening and scanning of ballots. These efforts saved approximately

800,000 absentee-by-mail ballots from likely challenge in post-election litigation.

60.    In the same vein, Ms. Bernstein has voice displeasure to the Wake County Board of Elections during public comments in *eight* separate meetings for its failure to continue broadcasting its meetings remotely (a decision Defendant Sims made without the Board ever formally voting to stop remote broadcasts).

61.    Ms. Bernstein has attempted to raise public awareness of the failure by the Wake County Board of Elections to allow election night observation by the public in order to witness the vote count at the county level.  North Carolina General Statute § 163-182.2(a)(3) states, in part: "Any member of the public wishing to witness the vote count at any level shall be allowed to do so."  Defendant Sims, however, is staunchly opposed to election night observation even though at least thirty other counties in North Carolina permit such observation and some county boards acknowledge that witnessing the vote count at both the precinct and county level is required by North Carolina law.  Defendants prevent the public from witnessing the results poll tapes for early voting and absentee-by-mail voting at the county level on election night. The vote count for early and absentee by mail ballots are tabulated during a 2:00

23

pm public meeting on election day and the results poll tapes are printed and signed by Board of Elections members. The public, however, may not witness the "vote count" at that time, as those totals, by law, are to remain secret until after the polls close at 7:30 pm. Having the poll tapes in constant public view, with the "vote count" obscured, between the adjournment of the 2:00 pm meeting and the release of the 7:30 pm results via the NCSBE website is a necessary part of witnessing the vote count. The early voting and absentee by mail totals have been accidentally released to the public via the NCSBE website prior to 7:30 pm in at least two separate elections. Mr. Sims denies access to witness the vote count at the county level even though Wake County spent over four million dollars to renovate the Board of Elections facility, including the renovation of a large observation room that can accommodate at least 50 people, but this room remains empty on election night because Director Sims allows no observers.

62. Ms. Bernstein, much to the consternation of Defendant Sims, has been an advocate for other election integrity efforts, including an ongoing project to validate totals on poll tapes with totals reported by the counties to the State Board of Elections; the retention and public release of ballot images and cast vote records; meaningful observation of logic

24

and accuracy testing; observation of absentee meetings, observation training and outreach to the public; verification of the absence of modems in vote tabulators; the addition of tamper evident security seals on boxes of voted ballots; prohibition of unverifiable barcode ballots; use of hand-marked paper ballots; prohibition of partisan chain of custody of critical election materials; adoption of evidence-based elections; and helping the Libertarian Party of North Carolina obtain independent source code review and examination of voting systems, as required by State law.

63.　Defendant Sims has made no secret of his dislike for Ms. Bernstein.  In one instance, following a Board of Elections meeting, he aggressively approached her, in front of witnesses, and physically and verbally intimidated her prior to ejecting her from the meeting room along with a Republican Board member and another member of the public with whom she was speaking.

64.　In another instance, he refused to answer questions she had via email, stating instead that she would have to come to his office to meet with him in order for him to answer her question.  This was during the height of COVID pandemic, making a requirement to meet in person all the more unusual and unjustified.　Feeling uneasy at this requirement, Ms. Bernstein decided against personally meeting with

Defendant Sims at his office and suggested instead either a phone or zoom meeting, which Defendant Sims refused. Greg Flynn, a current member of the Defendant Board (who was also the former Board chair at the time) defended and condoned Defendant Sims' unreasonable demands. Board Member Greg Flynn, like Defendant Sims, has constitutionally invidious animus and hostility toward Ms. Bernstein as a result of her constitutionally protected activities and viewpoints.

65. Additionally, one member of the Wake County Board of Elections has admitted to Ms. Bernstein's husband that Defendant Sims deems Ms. Bernstein as "persona non grata" and that this animosity towards her goes back as far as 2018. This Board member also inquired about the reason for Defendant Flynn's dislike of Ms. Bernstein and added that they have themselves received extreme negative reactions for simply talking to Ms. Bernstein at meetings and working with her on statements she has given to the Board.

66. In another example, predating the trespass notice by two years, one or more members of the Board complained to the Wake County Democratic Party (WCDP) Chair about Ms. Bernstein's election integrity and transparency efforts. Defendants requested that she be removed from her position heading up the Election Task Force for the WCDP

26

because she was being vocal during public comment and on social media. Defendant Sims also forcefully voiced his displeasure to the WCDP Chair regarding Ms. Bernstein's efforts to view zero tapes during the 2020 Primary election.

67. Because Defendants continue to prevent the public from observing the vote count on election night, Ms. Bernstein decided that she would engage in a small, peaceful protest on May 17, 2022, at 7:30 pm to draw attention to the Board's exclusion of all members of the public. Ms. Bernstein planned to hold this peaceful protest on the sidewalk outside the grounds of the Board of Elections facility since Director Sims does not allow anyone either inside or outside of the building on election night. To determine where this protest could be safely and legally undertaken, she drove to the vicinity of the Wake County Board of Elections Operations Center on the afternoon of May 14, 2022. She was accompanied by John Brakey. Mr. Brakey is a nationally known expert in election integrity and the Director and Co-founder of AUDIT Elections USA, a 501(c)(3) founded in 2004 to advocate and litigate for public oversight of federal, state, and local elections.

68. As they drove by the Board's facility on New Hope Road in Raleigh, they saw yellow signs that read: "Board of Elections Event."

27

These were clearly not leftover signs from early voting. Instead, they indicated an active Wake Board of Elections event, which would be open to the public under state law. These signs were along the north side of the north parking, which is used by the public for meetings and voting. The Board does not publicize dates and times for its "events" (even though "events" and "meetings" alike are required to be open to the public under State law); the Board only publicizes dates and times for "meetings." There have historically been many Board of Elections "events" at the Operations Center (also commonly called the "warehouse") that were open to the public, but that were never publicly announced or advertised.

69. Ms. Bernstein had intended to park in the other public parking lot in front of the Board's building, but saw a temporary sign stating "No Public Parking" and a sign indicating that election equipment was being picked up by poll workers for the upcoming election. What was happening on the south side of the building was different from the "Board of Elections Event" happening on the north side of the building. So as to not interfere with the activities taking place at the BOE, Ms. Bernstein and Mr. Brakey decided to err on the side of caution and parked offsite

in a parking lot, adjacent to, but not belonging to the Board of Elections after originally trying to park across the street from the Board's property.

70.    While parking, before they even began walking in front of the Board warehouse, they observed Defendant Sims walk outside to speak with a security guard outside of the warehouse.  Mr. Brakey exited the vehicle, waved to Mr. Sims and said "hello."

71.    Defendant Sims was in close proximity to Mr. Brakey and Ms. Bernstein when they parked, and he could have easily told them that the Board's property was closed or otherwise asked them not to enter Board property, but he did not do so.  Defendant Sims gave no indication to either Ms. Bernstein or Mr. Brakey that the warehouse was closed to the public.

72.    Mr. Brakey took photos of the election processes that were taking place, an action that was fully legal and permitted under North Carolina and federal law.

73.    Upon information and belief, the warehouse was in fact still open to the public at this time and at all times relevant to this amended complaint, as evidenced by the signage placed on the property, the fact that its gates were open, and the failure of Defendant Sims or any agent or employee of the Board to verbally state that the warehouse was closed.

29

74. After parking, Ms. Bernstein and Mr. Brakey walked along to the public right of way by the street toward the warehouse. There were no signs on the property indicating that the event was "closed" or stating, "No Trespassing." During this time, Mr. Brakey was taking photos to document the signage outside of the buildings.

75. At 4:51 pm, Mr. Brakey and Ms. Bernstein walked toward the Board of Elections event, and Mr. Brakey entered four or five steps inside the open gate. By all outward indications, there was a public event taking place on the north side of the warehouse and the warehouse was open to the public at that time so there would have been nothing illegal in Mr. Brakey seeking to attend it as a member of the public.

76. Subsequently obtained surveillance video shows this gate and the other gate leading into that parking lot had been open all day, *at least since 6:00 am*.

77. As soon as Mr. Brakey stepped inside the gate, however, the gate began to close. This was the first time the gate closed since it opened that morning.

78. Mr. Brakey quickly exited to the other side of the gate which apparently tripped the gate's safety sensor, and the gate retracted. Although Mr. Brakey exited to the other side of the gate, he seems to

30

have still been in the vicinity of the gate's safety sensor. The gate began to close and retract two more times, but neither Mr. Brakey nor Ms. Bernstein attempted to enter the gate after it first started to close.

79. Ms. Bernstein and Mr. Brakey were not attempting to control the gate's movements for any reason at all, but instead trying to remain out of its way so as to not interfere with the gate's closing.

80. Ms. Bernstein and Mr. Brakey moved away from the gate and later returned to Ms. Bernstein's vehicle. In total, they spent a little more than 60 seconds in general proximity to the open gate, all of which is documented on County surveillance video showing they did nothing wrong.

81. Further indicating that the closing of the gate was specifically to target and harass Ms. Bernstein and Mr. Brakey, County surveillance video shows the other (north) gate leading to the same parking lot remained open until 8:00 pm and did not close during the time the gate in question was closing.

82. Upon information and belief, Defendant Sims was—either directly or indirectly through his agents or employees—activating the electronic gate to close at this precise time.

31

83.     At no time did Ms. Bernstein ever enter upon, or try to enter upon, Board of Elections property.  Subsequently obtained video shows that neither of Ms. Bernstein nor Mr. Brakey crossed the plane of the gate after Mr. Brakey exited.

84.     At no time did Ms. Bernstein ever go into the parking lot past the open gate.

85.     At no time were Ms. Bernstein or Mr. Brakey ever told they were not allowed to come onto Board of Elections property, and at no time prior to the trespassing order was either asked to leave by Defendant Sims, Officer Carter, or any other person.

86.     Ms. Bernstein and Mr. Brakey, after returning to the adjacent property, were standing next to her vehicle talking when an officer from the Raleigh Police Department arrived and began speaking with Officer Carter, the security officer who also works for the Board of Elections at public board meetings and events.  While the officers were speaking with Ms. Bernstein and Mr. Brakey, Officer Carter incorrectly stated that Ms. Bernstein and Mr. Brakey had "attempted to get in by tampering with the gate," which she stated was "closed."  Ms. Bernstein and Mr. Brakey disputed these allegations, and the officers, after one of them made a

phone call to Wake County Security, then conceded the gate was open when Ms. Bernstein and Mr. Brakey were near the gate.

87. The officers stated specifically that Defendant Sims had ordered that they be formally "trespassed." The officers completed paperwork to document the "trespassing."

88. During this conservation, Officer Carter specifically agreed that Ms. Bernstein has never been disrespectful to anyone during Board of Elections meetings or during interactions with the Board.

89. Upon information and belief, at this time, Officer Carter was a contractor for the Board of Elections, through a private security company, but she was not employed by the Wake County Sheriff's Department on that date (having separated from that employer previously). Nevertheless, she falsely represented herself as an off-duty deputy with the Sheriff's Department when she called Raleigh police for assistance. Additionally, she acted at the direction and control of Director Sims as all times on May 14, 2022, following all of his instructions.

90. Based on video evidence from the date in question, Officer Carter was wearing a firearm on the premises of the warehouse, where

voting was occurring and at the time of voting, in violation of North Carolina law.

91.    Ms. Bernstein and Mr. Brakey had committed no crime, and neither was charged with any criminal offense by the law enforcement present.

92.    Defendants falsely state in their brief supporting their motion to dismiss that Ms. Bernstein was "interfering with the operation of a security gate," and then misleadingly contend that this conduct prompted a call to 911.  In actuality, Defendant Sims had directed Officer Carter to call for law enforcement, while both Ms. Bernstein and Mr. Brakey were lawfully engaged in driving and then walking along a public street, well before any incident with a security gate.

93.    Furthermore, while the trespass order was technically signed by the Raleigh Police Department, the officer issued the order at the specific insistence and direction of Defendants, in particular Defendant Gary Sims.   The Raleigh police officer present made statements indicating to Ms. Bernstein that she thought the banning was not warranted and encouraged her to try to talk to Defendant Sims' superiors to get the trespassing revoked.  Clearly, the Raleigh Police Officer issued the trespass only because it was requested by Defendant Sims and not

34

because of any independent basis arrived at on her own, essentially as would be done for a ban from private property. The ban is thus the action, decision, and policy of the Defendants, rather than the Raleigh Police Department, produced through the direct action of Defendant Sims and later ratified, approved of, and affirmed by Defendant Board.

94. Defendant Sims, rather than following Wake County policies for trespass orders, violated those procedures and instead directed a trespass of Ms. Bernstein and Mr. Brakey as if the Board's property were his own private property to ban individuals for good cause, bad cause, or no cause at all. Defendant Board, through its actions and omissions, has ratified, approved of, endorsed, and affirmed Defendant Sims' actions in this regard and has not directed that the official policy for Wake County governmental entities be followed.

95. Defendant Sims instructed Officer Carter to tell police, prior to their arrival, that *he* wanted Ms. Bernstein and Mr. Brakey trespassed, showing the decision was made by Defendant Sims himself.

96. At 5:56 pm, Ms. Bernstein and Mr. Brakey departed the parking lot where they were parked.

97. Two days later, on May 16, 2022, the Wake County Board of Elections held a public meeting. Ms. Bernstein's husband attempted, in

35

a calm and professional manner captured on audio, to address the Board of Elections concerning the events of the prior Saturday and ask that the banning of his wife from Board of Elections property be rescinded. Ms. Bernstein could not speak on her own behalf because she was banned from the Board of Elections with the threat of arrest if she came onto its property. Even though each speaker was supposed to be allotted two minutes to speak, the Board permitted Ms. Bernstein's husband *less* than two minutes to speak before its Chair directed a security officer to remove him from the meeting. Mr. Bernstein also spoke at two subsequent meetings, on May 17 and May 26, and Ms. Bernstein's 14-year-old daughter submitted a written request to the board at the May 17 meeting, asking that the trespass against Ms. Bernstein be revoked.

98. Defendant Board took no action to revoke, suspend, or otherwise modify the permanent and indefinite ban on Ms. Bernstein at that meeting or at any time since even though: each member of the Defendant Board is aware of the ban on Ms. Bernstein; has been informed of and is aware of her desire to have the ban lifted; and each member of the Defendant Board has had an opportunity to review any evidence in Defendants' possession. Despite this knowledge, Defendant Board has failed to act on Ms. Bernstein's requests that the ban be removed.

36

99.     Each member of the Defendant Board, as well as the Board itself, has therefore ratified, affirmed, endorsed, and concurred in the ban on Ms. Bernstein, thereby making the ban official policy for Defendants.

100.   In filings made in this Court, Defendants have specifically stated that they would trespass anyone who tampered with a security gate.  Even though Ms. Bernstein did not tamper with a security gate, Defendants' admissions to this Court constitute a statement of official policy, the legality of such policy is challenged by Ms. Bernstein in this lawsuit.

101.  The ban on Ms. Bernstein continues to be in effect, and Defendants are actively defending the legal legitimacy of the ban in this Court.

102.  Though not entirely clear from the written trespass paperwork, it is Ms. Bernstein's legitimate fear that the "trespassing" applies to *any* Wake County Board of Elections property, even if that property is accessed only for purposes of voting and even if that property is only temporarily under the Board's control as a polling place.

103.   Ms. Bernstein voted in person in the primary election held on May 17, 2022, days after she was trespassed, because she did not realize at that time that the ban would likely apply even to voting at her home

37

precinct polling place. After physically coming to her polling place to vote on election day and reflecting on the events afterwards, however, she became fearful that she would be charged with criminal trespass because of Defendants' ban—a concern she continues to have to this day, despite statements recently made by Defendants in the course of this litigation. Therefore, Ms. Bernstein voted in the 2022 second primary held on July 26, 2022, by means of an absentee ballot, which her husband had to deliver to the Board on her behalf.

104. In light of Defendants' extremely hostile prior conduct toward her, Ms. Bernstein legitimately fears that the ban will be interpreted by Defendants in a manner that will inflict as much harassment and detriment to her rights as possible.

105. Given the prior hostility from Defendants toward Ms. Bernstein, she is justified in fearing that Defendants will exploit any ambiguity in the trespass order to prevent her from exercising her rights.

106. As a result, not only is Ms. Bernstein deprived of the opportunity to come to Board meetings and events, but she also cannot file to run for office in person, take poll worker training, work as a poll worker, be a political election observer, or even serve as a poll greeter at the warehouse. And because the Board does not provide any means for

38

members of the public to view its meetings and events virtually, she cannot watch Board meetings or events as they are occurring, let alone participate and comment remotely. This is because the Board of Elections is headquartered at, and conducts these activities at, the warehouse, from which Ms. Bernstein is indisputably forever banned.

107. Ms. Bernstein cannot even vote in-person early or in-person at her precinct on election day without fear of being charged with a crime.

108. Importantly, in-person voting *on election day* is the only method of voting in North Carolina that affords the voter a secret ballot. Early voted ballots and absentee by mail ballots have unique numbers that identify each voter in case a ballot has to be retrieved after the election, thereby meaning they are not secret ballots.

109. Defendants have failed to observe Ms. Bernstein's constitutional rights and have even failed to adhere to Wake County's own official policy for making trespass determinations and hearing appeals of trespass orders. Defendant Board failed to properly train and supervise its employees and agents, including Defendant Sims and Officer Carter, in how to respect the constitutional rights of those being "trespassed," including by failing to train and supervise them on Wake County's own trespass policies and procedures, in addition to

39

constitutional restrictions on the government's right to ban individuals from government property. Rather than remedy this deficiency in training and supervision, Defendants have ratified, adopted, endorsed, and affirmed the actions of their employees and agents, including Defendant Sims and Officer Carter, with respect to the ban on Ms. Bernstein, including by continuing to enforce the ban and defending the legitimacy of the ban in this Court.

110. In their filings with this Court, Defendants have represented that Ms. Bernstein is not banned from voting at her home precinct or from being present at any other precinct or voting location in Wake County. This distinction totally undermines any purported justification for banning Ms. Bernstein because the Board's warehouse is an indisputably secure facility with armed guards, surveillance cameras, gates, and fencing with razor wire—to name but a few of its security features. By contrast Ms. Bernstein's home voting precinct (Piney Planes Christian Church in Cary), being a relatively simply facility, lacks most or all of those features. Other voting precincts, which—according to Defendants—Ms. Bernstein can visit for such purposes as being a poll greeter, typically lack significant security measures as well. It is wholly unreasonable to believe Ms. Bernstein is a threat to elections procedures

40

at the warehouse where there is a high level of security, but that she poses no threat to election procedures at far less secure sites like Piney Plains Christian Church. This inconsistency in Defendants' reasoning totally undermines any justification for banning Ms. Bernstein, and it further supports Ms. Bernstein's fear that the ban would be used against her if she casts a vote in person at her home precinct on election day.

111. What is clear is that banning Ms. Bernstein from the warehouse prevents her from attending and speaking at Board of Elections meetings, which is closer to the real motive behind Defendants' ban: silencing Ms. Bernstein and stifling her legitimate political advocacy because they do not like its content and viewpoint.

112. In their filings with this Court to date, Defendants have made several false and contradictory statements, which evidence animus and pretext, including the following:

    a. Defendants state in their Response in Opposition to Plaintiffs' Motion for Preliminary Injunction, "It is obvious that Plaintiff would not have been trespassed if she had not tampered with the gate." But, Ms. Bernstein never tampered with the gate, never entered the gate, never touched the gate, always

41

remained outside the gate, and always remained outside Board property delineated by the gate/fence.

b. There are a number of incorrect statements in the Affidavit of security officer Janice Carter submitted to this Court. Officer Carter states that Ms. Bernstein's vehicle was "suspicious" because she parked at Westshore Home and that business was closed with no other cars in the parking lot. In actuality, Westshore Home was open, and there were three other cars and a truck in the parking lot. Ms. Bernstein entered the Westshore Home parking area at 4:29pm. According to Westshore Home's Google page, the hours of operation on Saturdays are 8:00 am to 8:00 pm.

c. Officer Carter also falsely states in her Affidavit that Ms. Bernstein was parked at Westshore Home for "approximately 15 minutes." Ms. Bernstein was actually parked at Westshore Home for a total of 2 min and 50 seconds, as shown on Ms. Bernstein's car cam video.

d. Officer Carter falsely states in her Affidavit that Ms. Bernstein had been "confrontational" in the past, but when she is talking to Ms. Bernstein at her car, which is on audio

42

recording, she acknowledges and admits that Ms. Bernstein has always been respectful.

e. Officer Carter falsely states in her Affidavit that Plaintiff was at the Board to hold the BOE "accountable" and make sure it did not "jumble up" the elections, but Ms. Bernstein never said any such thing, as is clear on her audio recording. In the audio recording, Ms. Bernstein explains to Officer Carter several times, that she was there looking for a safe, legal place where she could hold a small protest on Election Night. Ms. Bernstein asks Officer Carter multiple times if she could show her where they could legally hold a protest. Officer Carter stated that she thought the BOE property line was at the fence line.

f. When Officer Carter called Wake County dispatch she refers to herself as an "off-duty police officer." However, Ms. Carter states in her Affidavit that she had not been a sworn law enforcement officer since January 2022 and now works as security officer for Allied Universal.

g. Defendants make it sound problematic that Ms. Bernstein has not contacted the Board herself to ask the Board to rescind

43

the trespass. During the conversation on May 14, however, Officer Carter makes it clear to Bernstein that she should not even call the BOE regarding getting questions answered. Ms. Bernstein, in her continued attempts to follow the law and instructions from law enforcement has not attempted to contact the Board of Elections directly. Both her husband and her daughter have made pleas to the Board to rescind the trespass, but the Board did not respond, not even to discuss the matter or publicly speak one word about it.

h. The Affidavit of Christopher Heist submitted to this Court contains several concerning misstatements. Mr. Heist states that he works for Allied Universal Security Services as an Operations Manager, but his own LinkedIn page states that he has not been an Operations Manager since March 2019 and that his current title is Client Portfolio Manager.

i. Mr. Heist also attaches a Wake County Facility Security Incident report to his Affidavit as an exhibit that is supposedly a report on the opening and closing of the gate on May 14. Heist's Affidavit states that this report was prepared by Caleb Sparks but Caleb Sparks' own LinkedIn page says

44

he left the employ of Allied Universal in February 2021, over a year before he purportedly wrote the report. The report also refers to two different County surveillance videos, videos that were not provided to Ms. Bernstein even after multiple requests. County surveillance video provided to Ms. Bernstein clearly shows that she never entered the gate.

j. The report purportedly prepared by Caleb Sparks, however, which is an exhibit included with Mr. Heist's Affidavit, incorrectly states that both Ms. Bernstein and Mr. Brakey entered the BOE property "several more times, preventing the gate from closing." Contradicting this, is a statement in Officer Carter's Daily Report, attached to her Affidavit, stating that Wake County Security had reported that one person, a white male, had activated the gate.

k. The Affidavit of Olivia McCall, Assistant Wake County Elections Director, contains concerning inconsistencies. For example, in paragraph 6 of her Affidavit, Ms. McCall states that the Console Operator from Allied Security told her that there were two people at the gate and *one* of them, the male, was preventing the gate from closing properly. Then, in

45

paragraph 9, she states that both Ms. Bernstein and Mr. Brakey were interfering with the closing of the gate. Again, to be clear, Mr. Brakey stepped through an open gate. When it began to close, he immediately stepped back outside, which caused the gate to retract. Mr. Brakey was in no way attempting to tamper with the gate and Plaintiff never entered the gate.

l.  In her Affidavit, Ms. McCall also states that it was time to close the gate because Early Voting was over, implying that it was coincidental that a gate that had been open all day just happened to close the moment Mr. Brakey stepped through it. Surveillance video shows that Ms. McCall never had the rear gate closed to the same parking lot, and it remained open until 8 pm.

## COUNT I
**Violation of the First Amendment to the U.S. Constitution:
Prior Restraint; Content and Viewpoint Discrimination;
and Denial of Rights under the Petition Clause
(42. U.S.C. § 1983)**

113. The preceding paragraphs are hereby realleged and incorporated herein by reference.

114. The First Amendment to the United States Constitution, as applied to the States via the Fourth Amendment, guarantees the right to free speech as well as the right to petition the government for the redress of grievances.

115. By Defendants' actions, Ms. Bernstein has been totally prohibited from addressing the Wake County Board of Elections, attending any of its meetings or events, availing herself of the right to observe its meetings, events, and work alongside other members of the public, petitioning publicly the Board for or against potential action, or engaging in similar rights or activities.

116. Accordingly, Defendants have deprived, are currently depriving, and intend to deprive indefinitely Ms. Bernstein of her First Amendment rights.

117. Defendants' banning of Ms. Bernstein is a prior restraint on speech.

47

118. Prior restraints are presumptively unconstitutional and have been recognized as the most serious and least tolerable of infringements on the First Amendment.

119. The instant prior restraint is wholly unsupported by precedent.

120. The deprivation of Ms. Bernstein's First Amendment rights is directed at suppressing the content and viewpoint of Ms. Bernstein's speech, including at meetings and events of the Board.

121. Defendants' restrictions on Ms. Bernstein's speech cannot be justified by strict scrutiny because they are not justified by a compelling governmental interest and, even if they were, they are not narrowly tailored to achieve any such interest.

122. Instead, Defendants have imposed a total, unappealable, and indefinite ban on Ms. Bernstein's speech that is motivated by disagreement with her point of view.

123. Likewise, the restrictions on Ms. Bernstein's speech are not valid time, place, or manner restrictions because they are not content neutral, are not narrowly tailored to serve a significant governmental interest, and do not leave open ample alternative means for her to express her ideas.

124. Defendants have further barred Ms. Bernstein from exercising her rights under the Petition Clause of the First Amendment by denying her the right to appear at Board of Elections meetings and events and enjoy the same rights to observe, participate, and speak as any other citizen.

125. Additionally, the ban deprives Ms. Bernstein of the right and ability to invoke and avail herself of the Board's quasi-judicial powers in violation of the Petition Clause.

126. The purported justifications provided, and anticipated to be provided, by Defendants for the banning of Ms. Bernstein and otherwise restricting of her First Amendment rights are not based in fact, but are instead mere pretext which are contradicted by documentary evidence, including the County's own surveillance videos.

127. Defendants have already admitted to this Court that the only reason for the decision to ban Ms. Bernstein was the alleged tampering with a security gate. These allegations are false. Ms. Bernstein avers—and County surveillance video shows—that she never tampered with a gate, never entered a gate, never triggered the sensor on any gate, remained outside the gate, and always remained off Board property as delineated by the gate and fence. Plaintiff was not even seeking to enter

49

the gate; she was looking for a place to conduct a protest not on Board property.

128. While Mr. Brakey (not Ms. Bernstein) briefly stepped toward the gate to read its signs, he quickly left the property when the gate began to close.

129. Therefore, Defendants' purported justification for the ban is without factual basis.

130. As a direct and proximate result of Defendants' violations of Ms. Bernstein's rights under the First Amendment, Ms. Bernstein has sustained injuries, and she is therefore entitled to the relief set out in the prayer for relief below.

## COUNT II
### Violation of the Equal Protection Clause of the Fourteenth Amendment: Denial of the Right to Vote and Engage in the Political Process on Equal Terms
### (42. U.S.C. § 1983)

131. The preceding paragraphs are hereby realleged and incorporated herein by reference.

132. The Fourteenth Amendment to the United States Constitution provides, in relevant part, that "[n]o state . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1.

50

133. The rights secured by the Fourteenth Amendment are enforceable pursuant to 42 U.S.C. § 1983.

134. A citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in her jurisdiction.

135. Ms. Bernstein has feared, and continues to fear, that the ban applies to any precinct, including her designated precinct for voting, due to the ambiguity in Defendants' trespassing decision.

136. As a result of Defendants' decision to ban Ms. Bernstein it is indisputable that she cannot cast a vote at the Wake Board of Elections warehouse, which is regularly used as an early voting location, nor can she personally return her own absentee ballot to the Wake Board of Elections (the only location for returning such ballots), thereby requiring her to depend on either U.S. mail or a person authorized by state law if she wishes to vote by absentee ballot.

137. These restrictions on Ms. Bernstein's right to vote are unconstitutional in that they treat her differently than other similarly situated voters without the requisite constitutional justification.

138. As a result of this fear, Ms. Bernstein voted by absentee ballot in the July 26, 2022 second primary conducted for the Democratic primary for Wake County Sheriff and two town council seats in the Town

51

of Cary, and had an authorized individual deliver her ballot to the Board at the warehouse.

139. The denial to Ms. Bernstein of her right to cast a vote as she chooses under state law, due to the potential for criminal trespass charges, deprives her of the right to vote and otherwise in engage in the political process on equal terms as other voters in the jurisdiction and further constitutes an undue burden on her right to vote.

140. If the ban applies to voting at her home precinct, which Ms. Bernstein fears that it does, the ban thereby also denies her the right to cast a secret ballot, since in-person voting on election day is the only means allowed to cast a secret ballot under North Carolina law.

141. Additionally, Ms. Bernstein has been denied equal protection of the laws regarding her right to vote and engage in the political process when compared with similarly situated persons. The disparity in treatment of Ms. Bernstein impermissibly infringes on her fundamental rights and is therefore invalid under the Equal Protection Clause.

142. This disparity in treatment is not due to mistake, inadvertence, or legitimate reason.

143. This disparity necessitates immediate relief due to the upcoming elections in November of 2022.

144. As a direct and proximate result of Defendants' violations of Ms. Bernstein's rights under the Equal Protection Clause, Ms. Bernstein has sustained injuries, and she is therefore entitled to the relief set out in the prayer for relief below.

## COUNT III
### Violation of the Due Process Clause of the Fourteenth Amendment: Lack of Procedural Due Process
### (42. U.S.C. § 1983)

145. The preceding paragraphs are hereby realleged and incorporated herein by reference.

146. The Fourteenth Amendment to the United States Constitution provides, in relevant part, that "[n]o state . . . shall any state deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1.

147. The rights secured by the Fourteenth Amendment are enforceable pursuant to 42 U.S.C. § 1983.

148. At all times relevant to this case, Ms. Bernstein possessed a liberty interest in attending, observing, and speaking at public meetings and events of the Board of Elections and otherwise being present where other members of the public are allowed to be present.

53

149.  Defendants have now totally abrogated Ms. Bernstein's right to attend, observe, and speak at any public meetings and events of the Board of Elections and be present on Defendant Board's premises where other members of the public are allowed to be present.

150.  Defendants' decision was arbitrary and without any legal justification and was not grounded in any objective criteria that had previously been articulated publicly by Defendants.  Instead, Defendants' decision was based on constitutionally invidious motives.

151.  Defendants are unable to articulate any reasonable and objective basis for the ban on Ms. Bernstein even after it was imposed.

152.  The justification that Defendants have advanced in this litigation is contradicted by video evidence provided by Defendants themselves in response to public records requests because it shows Ms. Bernstein never entered upon Board property and never did anything to—and in particular did not tamper with—a closed security gate.  Said justification is merely pretext for Defendants' real motive, which is constitutionally invidious animus and hostility to Ms. Bernstein as well as the content and viewpoint of reflected in her public advocacy.

153.  Ms. Bernstein received no warning prior to being "trespassed."

154. Ms. Bernstein was not violating any law when Defendants had her "trespassed."

155. Ms. Bernstein is a law-abiding citizen who has no history of violating the law or creating a public disturbance, which Defendants knew when they banned her. They continue to ban her even though she presents no threat to anyone.

156. Ms. Bernstein was not acting in a disorderly or disruptive manner when Defendants had her "trespassed."

157. Ms. Bernstein was afforded no notice and opportunity to be heard either prior to the deprivation of her rights or afterwards.

158. After depriving Ms. Bernstein of these rights, Defendants made no procedures available for her to challenge the deprivation or otherwise appeal, and she was not given a chance to have her cause decided by a neutral decision maker.

159. Defendants in fact failed to adhear to the official policy for Wake County governmental entities by failing to notify her of a right to appeal and by failing to entertain any appeal of the trespass order.

160. The ban on Ms. Bernstein is indefinite, presumptively lasting for the rest of her life.

161. When Ms. Bernstein's husband tried to appear at a Board of Elections meeting to seek redress, he was allotted less than two minutes to address the Board before the Board's Chair directed a security officer to escort him out. There was no legal or legitimate basis for removing Mr. Bernstein from the Board meeting, further evidencing animus and hostility to Ms. Bernstein and the fact that the decision to trespass her was made based on constitutionally invidious motives.

162. Defendant Board failed to record in its minutes that it had Mr. Bernstein removed from the meeting. North Carolina law requires that such action be recorded in Board minutes, but the Board nevertheless failed to follow this statutory requirement. Upon information and belief, the failure to record the removal of Mr. Bernstein was made to prevent an official record of an action that further evidenced constitutionally invidious animus and hostility to Ms. Bernstein.

163. Mr. Bernstein then appeared at two more meetings asking for redress. No action was taken by the Board to remedy Ms. Bernstein's ban.

164. Defendants may have Ms. Bernstein charged with a criminal offense under North Carolina law if she violates the ban they have imposed on her.

56

165.  Ms. Bernstein legitimately fears that the ban extends even to property temporarily under Defendants' control, *viz.*, the precinct at which she would normally vote on election day or any other voting site in Wake County at which Ms. Bernstein might wish to serve as a greeter for a party or candidate or serve as an elections official.

166.  Defendant Board of Elections has adopted, ratified, endorsed, and approved of Defendant Sims' decision to ban Ms. Bernstein without due process of law.

167.  Ms. Bernstein has been denied her right to due process under the 14th Amendment to the U.S. Constitution, since the "trespass" has no official means of appeal and carries a criminal penalty if she enters the subject property in violation of Defendants' ban.

168.  As a direct and proximate result of Defendants' violations of Ms. Bernstein's rights, Ms. Bernstein has sustained injuries, and she is therefore entitled to the relief set out in the prayer for relief below.

## COUNT IV
### Retaliation for Exercising Rights
### Guaranteed by the First Amendment
### (42. U.S.C. § 1983)

169.  The preceding paragraphs are hereby realleged and incorporated herein by reference.

57

170. At all times relevant to this case, Ms. Bernstein has engaged in conduct protected by the First Amendment.

171. Such protected First Amendment conduct has included, but has not necessarily been limited to, the following:

    a.    Attending Wake County Board of Elections meetings and events;

    b.    Speaking at Wake County Board of Elections meetings and events;

    c.    Observing the activities of the Wake County Board of Elections, including the manner in which it tabulates votes;

    d.    Communicating with members of the Wake County Board of Elections to urge particular actions;

    e.    Organizing members of the community to become engaged in Wake County Board of Elections activities;

    f.    Writing, publishing, and speaking about Wake County Board of Elections activities;

    g.    Criticizing the Wake County Board of Elections and its Director, Defendant Sims, publicly for the manner in which they are discharging their duties under the law;

58

h.   Criticizing the Wake County Board of Elections and its Director before the North Carolina State Board of Elections and seeking to have their actions reversed; and

i.   Founding and managing a nonprofit organization to help mobilize positive change in the way elections are conducted in Wake County and elsewhere.

172. Adverse action was taken against Ms. Bernstein—namely, being forever banned from Wake County Board of Elections property—that would deter a person of ordinary firmness from continuing to engage in that conduct.  Said adverse action was taken by both Defendant Sims and Defendant Board of Elections.

173.  In point of fact, Ms. Bernstein is now prevented, on threat of criminal prosecution for trespass charges, from ever stepping foot on Wake County Board of Elections property (or, if Defendants are to be credited, then the Wake Board of Elections warehouse) for any purpose whatsoever, whether it be to speak, protest, or even cast a vote, as she would otherwise be entitled to do as a citizen of Wake County.

174. The threat of arrest and prosecution is deterring Ms. Bernstein from engaging in conduct protected by the First Amendment

as well as other provisions of the Constitution and laws of the United States. Such a threat would deter a person of ordinary firmness from continuing to engage in the protected conduct engaged in by Ms. Bernstein.

175. Ms. Bernstein's fears of arrest and prosecution are reasonable and well-founded.

176. There is a causal connection between Ms. Bernstein's protected conduct and Defendants' adverse action; that is, the adverse action was motivated by Ms. Bernstein's protected conduct.

177. Ms. Bernstein was in fact engaging in protected conduct, since the Board of Elections facility was open for a posted Board of Elections event, when the adverse action was initiated. Moreover, Ms. Bernstein has a long history of engaging in constitutionally protected conduct.

178. As a direct and proximate result of Defendants' violations of Ms. Bernstein's rights, Ms. Bernstein has sustained injuries, and she is therefore entitled to the relief set out in the prayer for relief below.

**COUNT V**
**Violations of the North Carolina Constitution**
**(N.C. Const., art. I, §§ 9-12, 14, 19; art. VI)**

179. The preceding paragraphs are hereby realleged and incorporated herein by reference.

180. The North Carolina Constitution protects both the right to free speech and the right to petition for redress of grievances. N.C. Const. art. I, §§ 12, 14.

181. Defendants have violated Ms. Bernstein's rights to free speech and to petition under the North Carolina Constitution by means of imposing a prior restraint on her speech, imposing content and viewpoint restrictions on her speech through banning her, denying her the right to petition, and retaliating against her for the exercise of these constitutional rights.

182. Article I, Section 19, of the North Carolina Constitution states, in relevant part: "No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land." The "law of the land" clause of the North Carolina Constitution contained in Article I, Section 19, protects the right to due process.

183. Defendants have violated the law of the land clause in that they deprived Ms. Bernstein of her liberty interest in attending, observing, protesting, and speaking at public meetings and events of the Board of Elections by banning her without cause, without notice, without

an opportunity to be heard, and without providing post-deprivation remedies.

184. Article I, Section 19, of the North Carolina Constitution also states: "No person shall be denied the equal protection of the laws[.]"

185. Defendants have violated the equal protection clause in that they deprived Ms. Bernstein of the right to vote and otherwise engage in the political process on equal terms as other voters in the jurisdiction and unduly burdened her right to vote, as well as denied her equal protection of the laws regarding her right to vote and engage in the political process when compared with similarly situated persons.

186. Several provisions of the North Carolina Constitution protect the right to vote, including Article VI as well as Sections 9, 10, and 11 of Article I. Ms. Bernstein's right to vote has been abridged and unduly burdened in violation of these protections.

187. Furthermore, even though the North Carolina Supreme Court has interpreted Article VI to include a right to cast a secret ballot, Ms. Bernstein fears she is now unable to cast a secret ballot since an absentee ballot (the only means of voting left to her) is not secret under North Carolina law.

188. Each of the above-referenced provisions of the North Carolina Constitution is enforceable against Defendants, government actors, by means of civil action.

189. North Carolina state law provides no other adequate remedy for Ms. Bernstein other than to sue, as with this suit, to enforce these constitutional protections.

190. To the extent necessary, these state constitutional claims are pleaded in the alternative to other of Ms. Bernstein's claims, pursuant to Fed. R. Civ. P. 8(d)(3).

191. As a direct and proximate result of Defendants' violations of Ms. Bernstein's rights, Ms. Bernstein has sustained injuries, and she is therefore entitled to the relief set out in the prayer for relief below.

## COUNT VI
### Common Law Assault
### (Against Defendant Sims in
### His Individual Capacity Only)

192. The preceding paragraphs are hereby realleged and incorporated herein by reference.

193. Upon information and belief, on the afternoon of May 14, 2022, Defendant Sims intentionally manipulated an electronic gate—

either directly or through an agent or employee—with the intent to try to hit or appear to potentially hit Ms. Bernstein.

194. Furthermore, on October 5, 2021, Defendant Sims physically intimidated Ms. Bernstein and caused her to fear physical assault by getting less than an inch from her face and angrily directing her to leave the Board of Elections meeting room while she was having a polite conversation with another individual following a Board meeting. Ms. Bernstein had angered Defendant Sims because during that evening's meeting she had advocated for greater public transparency from the Board.

195. It is a common occurrence for Board members and members of the public to engage in conversations in the Board room after a meeting; such conduct has never before been considered to be "trespassing" or otherwise illegal. If there is announcement that the room or building is closing, individuals leave without incident.

196. Ms. Bernstein has never refused to leave the Board room or building following a meeting if asked to leave. Any assertion by Defendants to the contrary is wholly untrue.

197. Through the actions of Defendant Sims, Ms. Bernstein was placed in reasonable and immediate apprehension of harmful or offensive bodily contact on these occasions.

198. Stated otherwise, the actions of Defendant Sims on each of these occasions caused Ms. Bernstein to fear immediately that she would be harmed or would receive offensive bodily contact.

199. Defendant Sims was, on the occasions of the alleged assault, acting outside of the scope of his authority as an employee of the Defendant Board, and therefore he enjoys no immunity from these claims under state law.

200. Defendant Sims is liable in his individual capacity for these torts.

201. To the extent necessary, these state law claims are pleaded in the alternative to other of Ms. Bernstein's claims, pursuant to Fed. R. Civ. P. 8(d)(3).

202. As a direct and proximate result of Defendant Sims' actions, Ms. Bernstein has sustained injuries, and she is therefore entitled to the damages and other relief set out in the prayer for relief below.

## COUNT VII
## Common Law Defamation
## (Against Defendant Sims in
## His Individual Capacity Only)

203. The preceding paragraphs are hereby realleged and incorporated herein by reference.

204. On the afternoon of May 14, 2022, in statements to law enforcement, Defendant Sims falsely accused Ms. Bernstein of trespassing and tampering with a closed gate and made other statements to law enforcement tending to indicate that she was a threat to the safety and security of Defendants property and operations and not to be trusted.

205. Defendant Sims thereby accused Ms. Bernstein of criminal conduct.

206. Defendant Sims knew his accusations were false when he made them to law enforcement.

207. Upon information and belief, Defendant Sims has repeated his false accusations to others, including members of the Defendant Board.

208. As a result of Defendants Sims' defamation, Ms. Bernstein has lost opportunities to speak and present with certain organizations.

209. Defendant Sims was, on the occasions of the alleged defamation, acting outside of the scope of his authority as an employee of the Defendant Board, and therefore he enjoys no immunity from these claims under state law.

210. Defendant Sims is liable in his individual capacity for these torts.

211. The defamation of Ms. Bernstein by Defendant Sims entitles her to presumed damages under North Carolina law.

212. To the extent necessary, these state law claims are plead in the alternative to other of Ms. Bernstein's claims, pursuant to Fed. R. Civ. P. 8(d)(3).

213. As a direct and proximate result of Defendant Sims' actions, Ms. Bernstein has sustained injuries, and she is therefore entitled to the damages and other relief set out in the prayer for relief below.

# COUNT VIII
## Declaratory Judgment Relief
### (28 U.S.C. §§ 2201-02; N.C. Gen. Stat. § 1-253 *et seq.*)

214. The allegations of all preceding paragraphs are hereby realleged and incorporated herein by reference.

215. An actual controversy exists between the parties.

216. In particular, there is controversy between the parties as to such issues as: (1) whether Ms. Bernstein may come onto property, other than the Board warehouse, if it is under the control of Defendants; (2) whether Defendants failed to follow proper protocols, policies, and procedures, when they banned Ms. Bernstein; (3) whether the ban on Ms. Bernstein is lawful and supported by evidence; and (4) whether Defendants have the constitutional authority to ban an individual from governmental property indefinitely and without appeal.

217. A declaratory judgment is necessary and appropriate as it would serve a useful purpose in clarifying and settling particular legal issues between the parties and thereby afford relief from much of the uncertainty and controversy giving rise to this proceeding.

218. Accordingly, under 28 U.S.C. §§ 2201-02 and N.C. Gen. Stat. § 1-253 *et seq.*, Rule 57 of the Federal Rules of Civil Procedure, and Rule 57 of the North Carolina Rules of Civil Procedure, Ms. Bernstein prays

68

for declaratory and related relief declaring and defining the rights among the parties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lynn Bernstein respectfully prays that this Court grant the following relief:

1.  Grant preliminary and permanent injunctive relief;

2.  Grant an appropriate declaratory judgment;

3.  Grant her appropriate compensatory damages for the violation of her rights;

4.  Grant her prejudgment and post-judgment interest;

5.  Grant her attorneys' fees and costs pursuant 42 U.S.C. § 1988, N.C. Gen. Stat. §§ 6-21.5 and 6-21.7, and as may be otherwise allowed by applicable law;

6.  Tax costs of this action against Defendants; and

7.  Grant her such other and further relief as this Court may deem just and proper.

Respectfully submitted, this the <u>13th</u> day of October, 2022.

[*Signatures appear on following page.*]

LAW OFFICE OF B. TYLER BROOKS, PLLC

BY: /s/B. Tyler Brooks
B. Tyler Brooks
N.C. Bar No. 37604
btb@btylerbrookslawyer.com
P.O. Box 10767
Greensboro, North Carolina 27404
Telephone: (336) 707-8855
Fax: (336) 900-6535

HUBBARD LAW FIRM

BY: /s/Meredith Woods Hubbard
Meredith Woods Hubbard
N.C. Bar No. 38599
meredith@hubbardlawnc.com
150 Fayetteville Street
Suite 300
Raleigh, North Carolina 27601
Telephone: (919) 961-4262
Fax: (919) 930-8544

*Counsel for Plaintiff Lynn Bernstein*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed electronically with the Court's CM/ECF system on October 13, 2022, which will serve a copy on counsel for the defendants, as indicated below.

/s/B. Tyler Brooks
B. Tyler Brooks

**SERVED:**

Scott Wood Warren, Esq.
Allison Pope Cooper, Esq.
Roger A. Askew, Esq.
WAKE COUNTY ATTORNEY'S OFFICE
Post Office Box 550
Raleigh, North Carolina 27602

*Counsel for Defendants*

2