IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:22-cv-00277-BO

| | |
|---|---|
| LYNN BERNSTEIN, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> GARY SIMS, individually and in ) <br> his official capacity as Director of the ) <br> Wake County Board of Elections; and ) <br> WAKE COUNTY BOARD OF ) <br> ELECTIONS, ) <br> ) <br> Defendants. ) <br> _____ ) | **RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

Plaintiff Lynn Bernstein submits this response in opposition to Defendants' pending motion to dismiss (D.E. #17).

## NATURE OF THE CASE

Plaintiff Lynn Bernstein, a citizen of Wake County and longtime advocate for transparent elections, brings this action under 42 U.S.C. § 1983 to vindicate her constitutional rights, in particular her First Amendment rights, her right to vote on equal terms with other Wake County voters, and her right to due process of law.

Defendants Wake County Board of Elections and its Director deprived her of these rights on May 14, 2022, when, without warning and without affording her any due process protections, they "trespassed" Ms. Bernstein,

forever banning her from coming onto Wake County Board of Elections property, apparently even to cast a vote. Efforts to have the ban reversed by the Board haven fallen on deaf ears. Therefore, Ms. Bernstein sues to relieve her of the ongoing deprivation of her fundamental constitutional rights.

## STATEMENT OF FACTS

Even though it recently constructed a large observation area for the public to view the counting of votes, the Wake County Board of Elections ("BOE" or "Board") does not allow the vote count to be observed by the public on election night, and, in fact, does not allow any observers on the property after the 2:00 pm meeting on election day, although many other North Carolina counties allow such observation on election day and election night. Ms. Bernstein, founder of Transparent Elections NC[1] and a longtime advocate for elections that are verifiable, reliable, and trustworthy, believes this practice is contrary to state law, *see* N.C. Gen. Stat. § 163-182.2(a)(3) ("Any member of the public wishing to witness the vote count at any level shall be allowed to do so."), and moreover constitutes unsound policy; therefore, she has advocated for the BOE to change its practices and become more transparent.

---

[1] Ms. Bernstein, who holds a B.S. in Aerospace Engineering, is also a trained International Election Observer, a member of the Election Verification Network, a member of the National Voting Rights Task Force, a member of the State Audit Working Group (SAWG), a member of the Carter Center Advisory Council for Fair, Safe and Secure Elections in North Carolina, a Board Member of AUDIT USA Elections, and an active member of the Wake County Democratic Party. (Lynn Bernstein Decl. ¶¶ 3-4.)

To raise public awareness of the BOE's practice of excluding the public from observations, Ms. Bernstein decided to stage a peaceful, lawful protest with a small group of individuals on the public right-of-way near the BOE's Operations Center located at 1200 N. New Hope Rd, Raleigh, North Carolina 27610. She planned to hold this peaceful protest, on the night of the 2022 primary election (May 17, 2022) to draw attention to the fact that observers were not allowed inside the Operations Center on election night. She drove to the area of the Operations Center on the afternoon of May 14, 2022, to find a location where she and others would have a safe and legal place to protest on that evening. She was accompanied by John Brakey. Mr. Brakey is a nationally known expert in election integrity and the Director and Co-founder of AUDIT Elections USA, a 501(c)(3) founded in 2004 to advocate and litigate for public oversight of federal, state, and local elections.

As they drove by the BOE facility on N. New Hope Road, they saw a yellow sign that read: "Board of Elections Event." This did not appear to be a leftover sign from early voting. Instead, it indicated an active Wake BOE event, which would be open to the public. According to guidance Ms. Bernstein has received from an attorney for the North Carolina State Board of Elections, both BOE "meetings" and "events" are open to the public. In Ms. Bernstein's experience, the Board does not publicize dates and times for its "events;" the Board only publicizes dates and times for "meetings." There have historically

3

been many BOE "events" at the BOE Operations Center (also commonly called the "Warehouse") that were open to the public, but that were never publicly announced or advertised.

After driving by the Operations Center, they turned around and drove back down N. New Hope Road. The Operations Center has two driveways coming off of N. New Hope Road, leading to two different parking lots on either side of the BOE building. The lot where Ms. Bernstein normally parks had, on that day, temporary signage stating "No Public Parking" because the Chief Judges (poll workers) were picking up voting equipment for the precincts on election day. The second parking lot had automobile activity coming and going and temporary signage stating, "Board of Elections Event." Ms. Bernstein thus could not park in the lot where she normally parks and did not want to interfere with, or be accused of interfering with, the Board of Elections event. Therefore, Ms. Bernstein and Mr. Brakey decided not to park at the Operations Center, even though she has parked there many times when attending meetings and events at that facility.

Instead, she parked offsite in a parking lot immediately adjacent to, but not belonging to, the BOE after originally parking briefly (for less than three minutes) across the street from the BOE's property. While parking in the adjacent lot, they observed Defendant Sims walk out to speak with a sheriff's deputy outside of the Operations Center. When Mr. Brakey exited the vehicle,

4

he was only about 20 feet away from Mr. Sims, on the other side of the chain link fence. Mr. Brakey waved to Mr. Sims and said, "Hello" (or words to that effect). Defendant Sims did not respond or acknowledge Mr. Brakey's presence.

After parking, Ms. Bernstein and Mr. Brakey walked along the public right of way beside N. New Hope Road, continuing to look for a good location for the planned protest. They observed no signs on the BOE property indicating that the event was "closed" or stating, "No Trespassing."

At 4:51 pm, Mr. Brakey and Ms. Bernstein reached the driveway of the north lot and after a few minutes, began walking up the driveway toward the BOE "event" while continuing to look for a good place to protest. Mr. Brakey wanted to get a better look at the signs along the inside of the fence where the ongoing BOE event was taking place, so he took four or five steps inside the open gate. Subsequently obtained surveillance video shows this gate had been open all day until the moment Ms. Bernstein and Mr. Brakey approached it. As soon as Mr. Brakey stepped inside the gate, however, it began to close. Mr. Brakey quickly exited to the outside of the gate, which likely tripped the gate's safety sensor, causing the gate to retract. The gate closed partway and opened 2 more times while Ms. Bernstein and Mr. Brakey were in the immediate vicinity of the open gate, so they moved away from the gate.

5

Ms. Bernstein and Mr. Brakey then continued walking past the BOE Operations Center towards the sidewalk adjacent to the north side of the BOE and next to a Walgreens before walking back to Ms. Bernstein's vehicle. In total, they spent a little more than 60 seconds outside the open gate, all of which is documented on County surveillance video. Videos showing the relevant parts of these events are attached to Ms. Bernstein's declaration as Exhibits 7 through 10. Based on video evidence obtained since that day, Ms. Bernstein now believes Defendant Sims was himself activating the electronic gate with a remote device at this time. The surveillance video that could clearly show what Sims was doing at this time, however, was withheld and not provided by the County in response to Ms. Bernstein's subsequent public records requests for all surveillance video on that day for the Operations Center and both gates. The available surveillance video shows Mr. Sims with something in his hand (such as a remote control) in addition to his cell phone and sunglasses.

While Ms. Bernstein and Mr. Brakey were standing next to her vehicle talking, an officer from the Raleigh Police Department arrived and began speaking with a sheriff's deputy who works for the BOE at public board meetings and events. The sheriff's deputy incorrectly stated that Ms. Bernstein and Mr. Brakey had "attemped to get in by tampering with the gate," which she stated was "closed." Ms. Bernstein and Mr. Brakey disputed these

6

allegations, and the officers, after one of them made a phone call to Wake County Security, then conceded the gate was open when Ms. Bernstein and Mr. Brakey had approached the BOE event.

The officers stated specifically that Defendant Sims had ordered that they be formally "trespassed." The officers completed paperwork to document the "trespassing." The officer specifically stated that Ms. Bernstein and Mr. Brakey had committed no crime, and they were not charged with committing a crime. The officer said, "Well, I'm not saying you, you did anything wrong. But like I'm saying, you know, if . . . if the person in charge of that property, they don't want you there for whatever reason, because they don't like what, you know, what party you're affiliated with, or who you are or what you represent[.]". And later in the conversation, the same police officer said, "[You] [m]ight, might want to go that route and file some sort of complaint against whoever this guy is. [It's] like you're being blackballed, you know[.]". At 5:56 pm, Ms. Bernstein and Mr. Brakey departed the parking lot where they were parked. The audio recording of this interaction is Exhibit 11 to Ms. Bernstein's declaration.

On the morning of May 16, Mr. Brakey and Ms. Bernstein went to the Raleigh Police station to inquire about the trespass notice and see what recourse was available. Police confirmed that their names were listed in law enforcement records for a having a trespass notice issued to them and that the

7

only way to get the ban removed was to have the "owner or manager" of the establishment remove it.

Also on May 16, 2022, the Wake County BOE held a public meeting. Ms. Bernstein's husband attempted, in a calm and professional manner captured in an audio recording, to address the Board concerning the events of the prior Saturday and ask that the banning of his wife from BOE property be rescinded. = He made this plea during the public comments section of the meeting. Ms. Bernstein could not speak on her own behalf because she was banned from the BOE with the threat of arrest if she came onto its property. Even though each speaker was supposed to be allotted two minutes to speak, the Board permitted Ms. Bernstein's husband less than two minutes to speak before someone directed a sheriff's deputy to remove him from the meeting.

The Board has never discussed the ban publicly and has taken no action to revoke, suspend, or otherwise modify the permanent and indefinite ban on Ms. Bernstein at that meeting or at any time since. Ms. Bernstein's husband returned to speak at two subsequent Board meetings, on May 17 and May 26, and Ms. Bernstein's 14-year-old daughter submitted a written plea to the Board at the May 17 meeting, to ask it to revoke the ban against her mother; but the Board has taken no action to revoke, suspend, or otherwise modify the permanent ban on Ms. Bernstein.

The ban on Ms. Bernstein continues to be in effect and is a permanent ban. When Ms. Bernstein asked the Raleigh Police at what point she could once again enter BOE property, the response was, "Never." Though not entirely clear from the written trespass paperwork she was shown, it is Ms. Bernstein's fear that the "trespassing" applies to any Wake County BOE property, even if that property is accessed only for purposes of voting and even if that property is only temporarily under the Board's control as a polling place. In light of Defendants' extremely hostile prior conduct toward her, Ms. Bernstein legitimately fears that the ban will be interpreted by Defendants in a manner that will inflict as much harassment and detriment to her rights as possible.

As a result, not only is Ms. Bernstein deprived of the opportunity to observe and speak at BOE meetings and many other civic and educational events hosted by the Board, but she also cannot file in person to run for office, take poll worker training, work as a poll worker, be a political election observer, return voter registration forms following registration drives, or even serve as a poll greeter. And because the BOE does not provide any means for members of the public to view its meetings and events virtually, she cannot watch Board meetings or events as they are occurring, let alone participate and comment remotely.

Ms. Bernstein cannot even vote in-person early or in-person on election day without fear of adverse action from the BOE. Ms. Bernstein voted in person in the primary election held on May 17, 2022, a few days after she was trespassed, because she did not realize at that time that the ban would likely apply even to her home precinct polling place. After physically coming to her polling place to vote and reflecting on the events afterwards, however, she became fearful she would be charged with trespass because of the BOE ban— a fear she continues to have to this day. Therefore, she voted in the 2022 second primary held on July 26, 2022, by means of an absentee ballot, which her husband had to deliver to the BOE on her behalf.

Importantly, in-person voting on election day is the only method of voting in North Carolina that affords the voter a secret ballot. Early-voted ballots and absentee-by-mail ballots have unique numbers that identify each voter in case a ballot has to be retrieved after the election, thereby meaning they are not secret ballots.

After being banned, Ms. Bernstein made public records requests under state law to obtain and preserve the evidence of the events at issue. While the BOE and Wake County responded to some of the requests, others remain unfulfilled to this day even after multiple requests.

## STANDARD OF REVIEW

A motion to dismiss a complaint under Rule 12(b)(6) tests the legal sufficiency of the allegations contained in a plaintiff's complaint. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). In considering a Rule 12(b)(6) motion, the court accepts as true all well-pleaded factual allegations and construes those allegations in the light most favorable to the plaintiff. See *Neitzke v. Williams*, 490 U.S. 319, 326-27, 109 S. Ct. 1827, 1832 (1989); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Thus, the complaint must contain sufficient facts that, if assumed to be true, state a claim for relief "that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007). The plaintiff's complaint must not rely merely on labels, conclusions, or a bare recitation of a cause of action's elements; otherwise, dismissal of the complaint is appropriate. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79, 129 S. Ct. 1937, 1949-50 (2009) (discussing *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955).

## ARGUMENT

The issue raised by the Defendants' present motion to dismiss under Rule 12(b)(6) is whether Ms. Bernstein's complaint states a plausible claim for relief. Because Ms. Bernstein has filed an amended complaint as a matter of right under Federal Rule of Civil Procedure 15(a)(1)(B), however, the motion to dismiss is now moot. To the extent the Court deems the motion to not be

11

mooted by the filing of an amended complaint, it is apparent that the original complaint plausibly describes claims against Defendants for its violation of Ms. Bernstein's legally protected rights.

Therefore, even if the motion to dismiss is not now moot, it should be denied in its entirety.

## I. DEFENDANTS' MOTION TO DISMISS IS NOW MOOT IN LIGHT OF THE FILING OF AN AMENDED COMPLAINT.

Defendants' pending motion to dismiss is now moot because Ms. Bernstein has timely filed an amended complaint as of right. "The general rule . . . is that an amended pleading supersedes the original pleading, rendering the original pleading of no effect." *Young v. City of Mt. Rainier*, 238 F.3d 567, 573 (4th Cir. 2001); *see, e.g., Blount v. Carlson Hotels*, No. 3:11-cv-452-MOC-DSC, 2011 U.S. Dist. LEXIS 140278, at *3-4 (W.D.N.C. Dec. 6, 2011). This Court has followed exactly this approach, finding a motion addressed to a pleading moot once an amended pleasing has been filed. *Campbell v. Enter. Holdings, Inc.*, No. 5:11-cv-424-FL, 2011 U.S. Dist. LEXIS 148302, at *1 n.1 (E.D.N.C. Dec. 27, 2011); *see also Lujan v. Chowan Univ.*, No. 2:17-CV-57-FL, 2018 U.S. Dist. LEXIS 133428, at *9 (E.D.N.C. Aug. 8. 2018) ("Where an amended complaint is forthcoming, motions to dismiss earlier complaints are denied as moot.").

Therefore, Defendants' motion should be dismissed as moot.

## II. TO THE EXTENT THAT THE MERITS OF THE MOTION ARE CONSIDERED, THEY EACH FAIL TO STATE GROUNDS FOR DISMISSING THE COMPLAINT.

### A. Municipal Liability

Defendants first argue at length that the Complaint fails to allege a policy, practice, or custom that would create official liability. Defendants' entire argument is premised on failing to recognize that the Board has *itself* decided to ban Ms. Bernstein, even after it has been asked to lift it and even defends the policy and decision in this Court as Defedants' official position regarding Ms. Bernstein. *See Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) ("Municipal policy may be found . . . in certain affirmative decisions of individual policymaking officials . . . or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens") (internal citations omitted). Such direct action by a body is the very creation of a policy or decision for which it can be liable. *See, e.g., Lund v. Rowan Cty., N.C.*, 863 F.3d 268 (4th Cir. 2017) (county liable for meeting prayers held to be unconstitutional).

### B. North Carolina Constitutional Law Claims

Defendants also badly misread North Carolina constitutional law. A plaintiff indisputably has the ability to sue to compel the state, or any of its entities, to follow the state constitution. *See Corum v. Univ. of N.C. ex rel. Bd.*

13

*of Governors*, 330 N.C. 761, 413 S.E.2d 276, 289 (1992)). That is all Ms. Bernstein seeks with these claims.

### C. State Tort Claims and Official Immunity

Defendant Sims argues with the nature of the allegations for Ms. Bernstein's assault and defamation claims, but they plaining allege all of the requisite elements for such claims. Defendant Sims' plea that he is immune likewise fails because the complaint is replete with allegations that he acted with malice and corruption and outside of his official capacity. *See, e.g., Wilcox v. City of Asheville*, 222 N.C. App. 285, 288, 730 S.E.2d 226, 230 (2012).

### D. Declaratory Judgment Claim

Defendants also equivocate in attempting to make it sound as if there is no issue as to which a declaration from this Court could be helpful. But, this is untrue. The complaint makes plain that there is a live dispute about the legality of Defendants' decision to trespass Plaintiff; and Defendants' motion makes the claim all the more live by challenging the extent of the ban on Ms. Bernstein. Thus, the requirements for seeking declaratory relief are met.

## CONCLUSION

For the foregoing reasons, Ms. Bernstein asks that the motion to dismiss be denied.

Respectfully submitted, this the 13th day of October, 2022.

        LAW OFFICE OF B. TYLER BROOKS, PLLC

        BY: /s/B. Tyler Brooks
        B. Tyler Brooks
        N.C. Bar No. 37604
        btb@btylerbrookslawyer.com
        P.O. Box 10767
        Greensboro, North Carolina 27404
        Telephone: (336) 707-8855
        Fax: (336) 900-6535

        HUBBARD LAW FIRM

        BY: /s/Meredith Woods Hubbard
        Meredith Woods Hubbard
        N.C. Bar No. 38599
        meredith@hubbardlawnc.com
        150 Fayetteville Street
        Suite 300
        Raleigh, North Carolina 27601
        Telephone: (919) 961-4262
        Fax: (919) 930-8544

        *Counsel for Plaintiff Lynn Bernstein*

**CERTIFICATE OF WORD COUNT**

The undersigned counsel certifies that the foregoing brief complies with Local Civil Rule 7.2(f) in that, according to the word count feature of his word processing software, it contains less than 8,400 words, excluding those parts that are allowed to be excluded by the Rule. According to the word count feature, this brief contains 3,538 words.

/s/B. Tyler Brooks
B. Tyler Brooks

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed electronically with the Court's CM/ECF system on October 13, 2022, which will serve a copy on counsel for the defendants, as indicated below.

/s/B. Tyler Brooks
B. Tyler Brooks

**SERVED:**

Scott Wood Warren, Esq.
Allison Pope Cooper, Esq.
Roger A. Askew, Esq.
WAKE COUNTY ATTORNEY'S OFFICE
Post Office Box 550
Raleigh, North Carolina 27602

*Counsel for Defendants*