IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:22-cv-00277-BO

| | |
|---|---|
| LYNN BERNSTEIN, )<br>)<br>  Plaintiff, )<br>)<br>v. )<br>)<br>GARY SIMS, individually and in )<br>his official capacity as Director of the )<br>Wake County Board of Elections; and )<br>WAKE COUNTY BOARD OF )<br>ELECTIONS, )<br>)<br>  Defendants. )<br>_____ ) | **REPLY DECLARATION**<br>**OF NICHOLAS BERNSTEIN** |

### DECLARATION OF NICHOLAS BERNSTEIN
### PURSUANT TO 28 U.S.C. § 1746

Pursuant to 28 U.S.C. § 1746, Nicholas Bernstein hereby declares as follows:

1. My name is Nicholas Bernstein. I am over the age of 18 and am suffering from no impairment or disability that prevents me from making this declaration. I am competent to testify to the facts stated herein, all of which are based on personal knowledge. All of the below statements are true and accurate to the best of my knowledge, information, and belief.

2. I have a degree in Physics from Dartmouth where I graduated *Magna cum Laude* in 1995.

3. I have a Masters Degree in Aerospace Engineering from The University of Colorado, Boulder, which was awarded in 2001. My focus was on Control Theory, a field which uses mathematical models of objects to

predict and control their behavior. I received a merit-based scholarship to attend the school and was the 7th annual recipient of the John Vice award for exceptional graduate student contributions to the department.

4. I also have a Ph.D. from The University of Colorado, Boulder. My dissertation (2007) focused on the friction modeling and control of haptic (touch) interfaces. This work has also been published in a peer-reviewed journal.

5. I have worked in the science and engineering field my entire adult life, starting as a science teacher for Teach For America. I then worked at AURA, the organization that runs the Hubble Space Telescope, before returning to Graduate School where I was a teaching assistant and research assistant. After receiving my Ph.D., I designed and built surgical simulators for a small company before accepting a job at Intuitive. I have spent the last 11 years working at Intuitive, the pre-eminent surgical and medical robotics company in the world, manufacturer of the daVinci surgical system.

6. While my technical jobs have varied over the years, my success has hinged on a handful of personal attributes: the ability to quickly assimilate new information, the ability to simplify and model complex systems, and the ability to detect and quantify errors and anomalies. These characteristics have been instrumental to my many contributions to the state of the art in medical robotics and are evident in my technical patents and patent filings.

7. As a Systems Analyst at Intuitive, my job requires me to routinely learn and utilize new software and techniques to analyze data, and develop solutions to technical problems. Since Intuitive is federally regulated by

the FDA as a medical device manufacturer, our analysis and changes are subject to extreme scrutiny. I receive continuous training in the areas of test validation, best documentation practices, and ethics

8. In the interest of finding and conveying the truth, I have compiled the evidence presented to the court into an audio/video presentation. The presentation represents my best effort in clearly and accurately presenting the sequence of events that occurred at the Wake County Board of Elections building on May 14, 2022.

9. The video compilation provided to the court is composed entirely of materials also provided in their raw form as evidence. The audio files were provided by a response from Wake County to public records requests. All of the videos presented as evidence derive from one of two sources:

    a. The public records request from Wake County General Services Administration (GSA). These videos were provided as .avi files in 3, 6, or 9 hour clips from 11 different surveillance cameras around the BOE building. Multiple clips can be played "synchronized" using the VideoPlayer software from Salient, which was also provided by GSA. The Salient software can also be used to validate the authenticity of these clips.

    b. The Thinkware U1000 front and rear facing cameras mounted on Ms. Bernstein's Subaru. These .mp4 clips are divided into 1 minute chunks at 30 frames per second (fps) when the car power is on. They are divided into 30 minute chucks at 2 fps when the car power is off.

10. The video compilation serves two primary purposes. First, it places the audio of the phone calls to Raleigh-Wake Dispatch (RWD) in the proper context in relation to the surveillance video. Second, it corrects for the relative timing errors between the video clips. This relative timing error is obvious when viewing multiple clips simultaneously in the Salient VideoPlayer. For example, the clips from cameras 6 and 9 that purport to start at noon on May 14, 2022, show a car pulling out of a parking spot in the front Parking Lot. The car shows up in a slightly different location at the start of each clip, which can be attributed to an approximate 2 second delay between the camera. As the car exits the parking lot, it is possible to compare the position of the car as shown in a third camera (camera 11) to determine the offset between that camera and the first two. Unfortunately, this relative difference between the camera timings is not consistent. Events that can be seen in multiple camera views occur at times differing up to 30 seconds or more in the time period between noon and 5:10 pm.

11. The video editing software VSDC was used to combine the multiple video clips together. The individual clips shown are copied from the original source and trimmed to show the time-frame of interest. The overlap between camera views make it possible to stitch together a continuous stream of action and adjust for this time discrepancy. For cameras views that do not overlap (such as Camera 3, which shows the gate, and Camera 9, which shows Mr. Sims in the front Parking lot), the offset in timing is determined by chaining multiple views together (Camera 3 overlaps with Camera 2, Camera 2 overlaps with Camera 6, Camera 6 overlaps with Camera 9). Numerous events that take place both before and after times of interest were compared to ensure that the

time adjustment was correct. As a secondary check, the passing of cars along North New Hope Road can be used to ensure that the adjustments are sensible and piece-wise continuous.

12. The root cause of the timing discrepancy is likely to be from variations in frame rates between the cameras (or perhaps dropped frames). As such, it is difficult to know if there is an overall time dilation. For example, one of the gates opens (according to the GSA time-stamp) at 6:00:10 am and closes at 8:00:17 pm. If this gate is programmed to open at 6:00 am and close at 8:00 pm, it would appear that there is a 7 second compression (speeding-up) of the video over the course of 14 hours. No effort has been made to adjust for this effect.

13. The audio of the calls to RWD have been matched to the video based on the approximate video timestamps and motions of Ms. Carter and Mr. Sims. While it is impossible to tell exactly when the phone calls are answered from the video, the beginning and end of the calls are believed to be synchronized to the video to within 500 milliseconds. The audio provided to us was redacted. Personal information such as names has been removed from the audio. Rather than just muting the audio, the redacted portions are actually removed from the clip. As such, the audio recording of the call is shorter than the time of the actual call. This can be corroborated by measuring the time in between the beginning and ending audio time-stamp. In the first of the two calls, approximately twenty seconds of the audio have been removed. Because there is more than one redaction in the first call, there is up to 20 seconds of uncertainty in the synchronization of the audio and video during the middle of the call. Based on natural language patterns and the motions

of Ms. Carter, it is believed that the actual discrepancy during the calls is less than 2 seconds.

14. The audio time-stamps from RWD are used as the "true" times. This time is shown in the bottom corner of the screen and has been synchronized to the start of the tone in the audio time-stamp to within 10 milliseconds. The RWD time on the compiled video shows 4:32:19 pm when Ms. Bernstein's car passes southbound in front of the South driveway. The GSA timestamp at that time is 4:33:30 pm and the timestamp from the GPS-synched dashboard camera is 4:34:07 pm.

15. When shown in the compilation, some clips have been geometrically transformed (scaled, rotated) to improve visibility. Two sections of video also feature highlighting (red circle outline and brightened circular outline). No other video editing (besides the time overlay) was performed. Any video scenes that look continuous were imported from either one clip or multiple sequentially recorded clips with no time delays introduced. The video compilation is the result of my best efforts to ensure an accurate, precise, and cohesive view of the events from that day.

16. A true and correct copy of the demonstrative exhibited generated from the above processes will be submitted as Exhibit 1 to this reply declaration.

17. In the days following the trespassing of John Brakey and my wife, Lynn Bernstein, I attended and made comments at three different Wake County Board of Election meetings in an attempt to convince the Board to take up a vote to allow access for my wife to BOE property. I was ejected from the first meeting before I was allowed to finish reading my prepared two-minute comment. In the second meeting, during a break,

I was approached by a Board member who told me that they felt obligated to come over and apologize for my expulsion the previous day. They invited me to call and discuss my concerns. Our encounter during the meeting was brief. The Board member covered their mouth as we talked, and they mentioned that they could "get in trouble" for talking with me.

18. I accepted the invitation, and we had multiple (three, I believe) amicable phone calls over the next month. Each conversation lasted between 30 minutes and 1 hour. In these conversations, the Board member made several notable comments. They are summarized below:

    a. They were not aware of, and did not participate in, any conversation or communication between defendant Sims and any Wake County BOE members about the events of 05/14/2022.

    b. Their understanding of the details came solely from their questioning of Officer Carter after they spoke with me.

    c. They apologized on multiple occasions, indicating that they were appalled by the animosity and behavior of the Board towards both my wife and myself.

    d. This member noted that they were not aware of any other instance where a member of the public was sanctioned or denied entry to the BOE building.

    e. They did not know of any reason for this animosity but noted that it "pre-dated" their appointment to the board. Specifically, they said that Mr. Sims deemed Ms. Bernstein as *"persona non grata"* from as far back as they could remember. The Board member has been on the board since 2018.

f. They remarked that they were most surprised by (Board Member) Greg Flynn's overt hostility towards my wife. They indicated that they *themselves* had received extreme negative reactions for simply talking to Ms. Bernstein at meetings and working with her on statements she had given to the board.

g. The Board member seemed confused when I said that there was no accusation that my wife committed an illegal act, because they had assumed that "she had to have done something or there wouldn't have been a basis for banning her."

h. In their discussion with Officer Carter, Carter had indicated that Mr. Brakey had put his foot in the gate beam. She did not mention that the gate was originally open and that Mr. Brakey was inside the gate when it started to close. After I mentioned this, they said that that was "entirely different." They also expressed surprise that this would be an issue at all, because as far as they were concerned the parking lot was public property

i. The Board member I spoke with described Officer Carter as "Gary's hire," and presumed she acted [called the police] because Gary insisted on it by "jumping up and down." It is not clear if this comment was literal or figurative.

j. The board member I spoke with indicated that they felt that the Board should have a hearing for Lynn to plead her case for readmission and said that it was obvious that she was not a threat to the BOE.

19. All of which has caused great stress in our home, and it has caused all of us to make sacrifices and adjustments. In particular, we are worried about retaliation, especially in light of the false allegations that have been continually made by Defendants against my wife.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: October 18, 2022 _____

Nicholas Bernstein

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:22-cv-00277-BO

| | |
|---|---|
| LYNN BERNSTEIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| GARY SIMS, individually and in his official capacity as Director of the Wake County Board of Elections; and WAKE COUNTY BOARD OF ELECTIONS, | ) ) ) ) ) |
| | ) |
| Defendants. | ) |

## **EXHIBIT NO. 1**

This is an audio or video recording for which electronic filing on CM/ECF is not possible. Pursuant to Section V.A of the Electronic Case Filing Administrative Policies and Procedures Manual, leave to file these exhibits manually will be sought, and a copy of a USB drive with said exhibits will be submitted to the Clerk of Court in conjunction with a motion for manual filing.